## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

**BRANDON RASHARD WATERS, and KASHANA SANGFIELD, on behalf of themself and all others similarly situated,**

      **Plaintiffs,**

**v.**

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, HIDAY & RICKE, P.A., JEFF RICKE, an individual, and ROBERT HIDAY, an individual,**

      **Defendants.**

_____/

**Case No.: 2:24-cv-293**

**CLASS ACTION**

## CLASS ACTION COMPLAINT

I.   **Preliminary Statement**

1.    In Florida, if you can't drive, you can't work. If you can't work, you can't support yourself or your family. This class action lawsuit targets one of the most deliberately cruel debt collection schemes designed to extort money from the working poor by unlawfully taking away their right to drive. The desperation caused by losing one's ability to drive, work and carry out basic functions of daily life creates tremendous pressure to find the money regardless of how badly it affects them personally.

2.     For years, Defendants have been unlawfully suspending the driver's licenses of low-income individuals to force them to make payments that they cannot afford.  The fact that this illegal scheme is carried out by State Farm—one of the largest providers of auto insurance in the United States—and members of the Florida Bar makes it even more troubling.

3.     Plaintiffs and members of the class are generally made up of lower-income individuals.  As a result of their limited income, they can only afford to carry the minimum amount of auto insurance required by Florida law.  These amounts are routinely referred to as 10/20/10 – which means that the insured must carry $10,000 of bodily injury coverage per person, with no more than $20,000 paid per accident, and $10,000 of property damage per accident. Fla. Stat. § 324.021(7).   If drivers carry these minimum limits, they are considered properly insured to drive in the State of Florida under Florida's mandatory insurance law known as the Financial Responsibility Law of 1955. *Id.*; See Fla. Stat. § 324.011 et seq.

4.     Because of the lower limits of coverage and the high cost of automobiles, it is not unusual for a properly-insured Florida driver to owe more money than their insurance covers in the aftermath of a car accident. For example, a relatively minor accident involving a new Mercedes can easily involve repair costs of $15,000.  When the at-fault driver's insurance company pays the $10,000 limit of coverage, the driver still owes $5,000 to the other driver for the additional damage.

These amounts that are owed over and above the amount paid by insurance routinely result in a personal judgment against the at-fault driver. Although Florida law permits the use of license suspension as a collection tool against uninsured drivers, the statute was never intended to be used against properly-insured Florida drivers.

5.     Using the above example as an illustration, and assuming State Farm insured the Mercedes owner, it would pay out the $15,000 repair costs to its insured, and then become the owner of its insured's $15,000 claim against the at-fault driver. When State Farm acquires such a claim, it brings a lawsuit in the name of its insured and routinely obtains a deficiency judgment for the balance between what the at-fault driver's insurer paid and what State Farm paid. This type of case is called a subrogation case, through which State Farm acquires the right to collect on these judgments through lawful liens or garnishments. Because many people who purchase the statutory minimum amount of insurance do so because they have limited income, those same people also have few assets that are subject to garnishment and their wages are often exempt. Collecting on judgments from these lower-income individuals is difficult because they simply do not have the money to pay.

6.     However, Defendants have orchestrated a scheme to extort payments from these properly-insured judgment debtors, regardless of its effect on these debtors or their families, by using collection leverage that is illegal and unjust.

3

Defendants' scheme involves the unlawful suspension of judgment debtors' driver's licenses, which is intended to jeopardize the debtors' ability to work and support their family in order to force them into onerous payment obligations. There is no legal basis for the suspensions, and they are orchestrated through deliberate fraud on the Florida Department of Highway Safety and Motor Vehicles ("DMV"), through which State Farm and its attorney collaborators hide the fact that the judgment debtors were properly insured at the time of the accident. By hiding this material fact from the DMV, the DMV is led to believe that the judgment debtors were uninsured and it wrongfully suspends their licenses.

7.    Once a judgment debtor's license is wrongfully suspended it may only be reinstated by making payment arrangements with Defendants. State Farm and its lawyers continue to use the threat of additional driver's license suspension and, if a payment is missed, actual driver's license suspensions to force continued payments, regardless of whether the judgment debtor can afford to pay and regardless of whether their assets would be otherwise exempt from collection efforts. These illegal suspensions also cause havoc on the personal lives of the judgment debtors. Plaintiff Brandon Waters lost several jobs as a result of having his license illegally suspended before he could come up with the demanded down payment. Plaintiff Kashana Sangfield has had to raise three children as a single mother on food stamps for the past three years without a driver's license because of Defendants' scheme.

The toll on these families caused by this unlawful and sinister practice cannot be overstated.

8.    In addition to the hardship caused by not having a drivers' license, judgment debtors must carry what is known as "SR22 insurance" for a period of three years following each illegal suspension. Fla. Stat. § 324.151. SR22 insurance has financial requirements that exceed the minimum requirements including that the deductible may not exceed $500 and that the insurer must pay out the coverage as though the deductible is $0. *Id.* SR22 insurance is for high-risk drivers, such as drivers who cause accidents while uninsured, are convicted of driving while under the influence of alcohol, and can cost an additional $150 per month. The imposition of SR22 insurance requirements on Mr. Waters and the members of the class only occurred because Defendants led the DMV to believe that they failed to carry the statutory minimum insurance during their accidents. Many insurance companies will not offer to cover a driver that must carry SR22 insurance.

9.    Jeff Ricke and Robert Hiday are Florida attorneys that founded, organized, and direct a collection law firm—Defendant Hiday & Ricke, P.A.—that provides subrogation collection services to nationwide insurance companies operating in Florida, including State Farm Mutual Insurance Company. Whether acting pursuant to explicit instructions from State Farm, or with State Farm's

knowledge and approval of this illegal collection practice, this law firm engages in the above-mentioned license-suspension scheme on State Farm's behalf.

10.    Plaintiffs, Brandon Waters, and Kashana Sangfield, and the Class they seek to represent suffered economic harm as a result of Defendants' illegal debt collection practices.

## II.    Parties to the Action

11.    Plaintiff, BRANDON RASHARD WATERS (referred to individually as "Mr. Waters"), is a resident of Lee County, Florida and was a resident of Charlotte County, Florida at times material to this action.

12.    Plaintiff, KASHANA SANGFIELD (referred to individually as "Ms. Sangfield"), is a resident of Escambia County, Florida and was a resident of Escambia County, Florida at times material to this action.

13.    Mr. Waters and Ms. Sangfield assert these claims individually and on behalf of all individuals similarly situated.

14.    Mr. Waters was a judgment debtor to State Farm Mutual Automobile Insurance Company as a result of a 2016 automobile accident.

15.    Ms. Sangfield is a judgment debtor to State Farm Mutual Automobile Insurance Company as a result of a 2016 automobile accident.

16.    Defendant STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY (referred to individually as "State Farm") is an Illinois corporation

registered to do business in the State of Florida. State Farm is one of the largest automobile insurance companies in Florida and the United States.

17.    Defendant HIDAY & RICKE, P.A. (referred to hereafter as the "Law Firm") is a Florida professional association, with its principal address at 4100 Southpoint Drive East, Ste. 3, Jacksonville, Florida 32216.

18.    Defendant JEFF RICKE ("Ricke") is a resident of Duval County, Florida and was a resident of Duval County, Florida at all times material to this action. He is the President and Managing Partner of the Law Firm.

19.    Defendant ROBERT HIDAY ("Hiday") is a resident of Duval County, Florida and was a resident of Duval County, Florida at all times material to this action. He is currently retired but maintains an "Of Counsel" relationship with the Law Firm.

20.    Defendants Ricke and Hiday founded and organized the Law Firm and, during the relevant period, directed the collection practices at issue here.

21.    Defendants Ricke and Hiday market the Law Firm as a premier subrogation debt collection firm for America's best-known insurance companies throughout Florida, specializing in all types of subrogation matters including the collection of property damage claims from auto accidents. They also market the Law Firm as a debt collector that collects judgment debts outside of the litigation context.

III.    **Statement of Jurisdiction**

22.    This action arises under Chapter 96 of the United States Code, more commonly known as the Racketeer Influenced and Corrupt Organizations Act (herein abbreviated as the "RICO Act"), 18 U.S.C. §§ 1961-1964.

23.    Pursuant to 18 U.S.C. § 1964(a), this Court has original jurisdiction over this action. The jurisdiction of this Court also arises under 28 U.S.C. § 1331. Supplemental jurisdiction over the state law claims exists pursuant to 28 U.S.C. § 1367.

24.    Pursuant to 28 U.S.C. §§ 1391(b)(2), venue is proper in the Middle District of Florida, Fort Myers Division.

IV.    **Factual Background**

A.    **Defendants Exploit Florida Statutory Procedures in their Mail Fraud Scheme**

25.    In 1955 the Florida Legislature passed Chapter 324 of the Florida Statutes and established the "Financial Responsibility Law of 1955" which established minimum insurance requirements for all Florida drivers.  Fla. Stat. § 324.011.  Section 324.021(7) requires that every Florida driver must obtain "Proof of Financial Responsibility" to respond to damages if an accident occurs by having coverage in the amount of $10,000 for bodily injury to one person, $20,000 for bodily injury to two or more persons, and $10,000 for property damage.  Fla. Stat. § 324.021(7). For purposes of this Complaint, the "10/20/10" insurance requirement

is identified as the "statutory minimum" amount of insurance coverage required by Florida law.

26.    This legislation, which is still in effect, includes provisions for revoking a driver's license if the driver or owner is ticketed or in a crash without having the statutory minimum amount of insurance.  Fla. Stat. § 324.121. The driver's license and registration can also be suspended "upon the written request of the judgment creditor or his or her attorney," after a judgment is entered against the uninsured driver.  Fla. Stat. § 324.121.  In other words, if the judgment debtor had the required minimum insurance at the time of the accident and any portion of such insurance has been tendered to the judgment creditor, no suspension should ever occur.

27.    On December 3, 1958, Florida's Attorney General was specifically asked to render an opinion as to whether a driver with the required minimum coverage could have his or her privileges suspended "as a result of the accident in an amount in excess of the 10/20/10 limits of liability required by §324.021(7)." The Attorney General's response was as follows: "If a person is properly insured, his insurance will satisfy the judgment to the extent of the limits provided in §324.021(7), F.S.  Accordingly, your 1st question is answered in the negative."

**B.    The Middle District of Florida Has Adopted the Attorney General Opinion**

28.    Since the 1958 Attorney General Opinion, there has been relatively little interpretation of suspension requirements of the Financial Responsibility Law.

However, in *Sanchez v. State Farm et. al.*, Case No. 3:21cv-00372 ("*Sanchez*"), Chief Judge Corrigan addressed a debt collector's practice of seeking to suspend the driver's licenses of properly insured Florida drivers. In S*anchez*, the same Defendants here, State Farm & the Law Firm, were requesting the suspension of driver's licenses of persons who were properly insured under Florida law.

29.    By Order dated March 21, 2023, Judge Corrigan ruled that the Attorney General and Plaintiff's interpretation of Fla. Stat. § 324.021 was correct, and held:

> [T]he plain language of § 324.131 is ambiguous. Based on the better reading of §§ 324.121 and 324.131, the DMV's reading of the statute, the persuasive authority of the Florida Attorney General Opinion, and the Williams case, because Sanchez carried the minimum insurance required by law, her license should not have been suspended based on the judgment entered in the personal injury action . . . [H]ere, it is undisputed that Hiday & Ricke knew that Sanchez had the required insurance when it sought suspension of Sanchez's license. Indeed, Progressive paid Sanchez's $10,000 policy limit directly to Hiday & Ricke as part of the mediated settlement. (Doc. 72-5 at 6). Thus, Hiday & Ricke's actions were in contravention of the statute.

30.    Following the Court's entry of the *Sanchez* Order (the "Order") holding that State Farm and the Law Firm violated Fla. Stat. § 324.021, Defendants (1) continued to suspend the driver's licenses of persons who were properly insured, (2) took no action to reinstate the driver's licenses of persons whom they had sought illegal suspensions against, and (3) took no action to remove the SR22 insurance obligations caused by the wrongful suspensions. All three of these actions and

inactions were committed in violation of Florida law and flagrantly ignored Judge Corrigan's explicit ruling.

31.    When some of Defendants' violations of the Court's Order were brought before the Court, the Law Firm filed a notice of compliance explaining that it had (1) stopped the practice of illegal driver's license suspension and (2) explaining that 12 persons were illegally suspended AFTER the Court's March 2023 Order. Conspicuously absent from this submission is whether the Law Firm took any efforts to reinstate licenses that were already suspended at the time of Judge Corrigan's Order.

32.    Upon information and belief, State Farm has made no effort to cease illegal driver's license suspensions, seek reinstatement for those judgment debtors whose driver's licenses remain illegally suspended, nor took steps to have the DMV remove the SR22 insurance obligations caused by the unlawful suspensions.  As a result, hundreds of properly insured Florida drivers continue to be unable to drive as a result of Defendants' unlawful license suspension scheme.

33.    Plaintiff *Sanchez* sought leave to add Mr. Waters to the case. By Order dated March 5, 2024, Judge Corrigan denied Plaintiff's Motion for Leave to Amend and add Mr. Waters, while reiterating the illegal nature of Defendants' conduct. This action was filed shortly thereafter so that Mr. Waters could represent a class of persons similarly situated.

C.    **The Law Firm Acted as State Farm's Agent**

34.    When a Florida driver is in an accident with a State Farm insured driver, State Farm is often legally responsible for paying the cost to repair or replace their insured driver's vehicle within weeks of the accident. State Farm may also pay for personal injuries caused by the accident. Once State Farm covers its insured's damages, State Farm obtains a subrogation right. Through subrogation, State Farm stands in the shoes of its insured and acquires its insured's claim against the other driver for the amount of property damage and/or personal injuries that State Farm paid. For example, if State Farm paid $15,000 to replace its insured's vehicle and $5,000 in medical costs, then State Farm obtains a subrogation right in the amount of $20,000 and may hire a law firm to pursue the State Farm driver's claim against the other driver (referred to as a "Subrogation Case").

35.    State Farm employs several different law firms, including the Law Firm, to prosecute its hundreds of Subrogation Cases throughout Florida each year. Upon information and belief, State Farm litigates Subrogation Cases with such high volume that State Farm enters into master agreements with select law firms where State Farm dictates the law firm's rules and procedures for representing it in Subrogation Cases.

36.    Upon information and belief, State Farm dictates exactly how each law firm should litigate its Subrogation Cases, including detailed steps on each stage of

the litigation process, what authority the law firm has to settle, the exact format of reports that need to be sent to State Farm, and how to engage in collections. Critical to the claims advanced in this case, State Farm also *requires* its Subrogation Case law firms to suspend driver's licenses of judgment debtors, whether they were properly insured at the time of the accident or not.

37.    Upon information and belief, State Farm hired the Law Firm and instructed the Law Firm to suspend the driver's licenses of properly insured judgment debtors if those judgment debtors failed to pay the judgments against them.

38.    In each communication and written action taken by the Law Firm against Plaintiffs and the Class, the Law Firm represented that it was acting on behalf of "State Farm Mutual Auto Insurance Company" and that the Law Firm is acting as State Farm's agent for litigation and collection purposes.

39.    State Farm had and has actual or apparent authority over the actions of its agents, including the Law Firm.

40.    At all times material to this case, the Law Firm and State Farm's other Florida subrogation firms acted as State Farm's actual or apparent agents in carrying out the unlawful suspensions at issue.

### D.    The Law Firm's Factory-Like Debt Collection Operation

41.    Defendants Ricke and Hiday have organized the Law Firm into a factory-like, debt-collection operation that employs mostly non-lawyers to conduct

pre-judgment litigation and post-judgment activities. They have organized these non-lawyers into several departments, each playing a particular role in the collection process. On information and belief, State Farm's other Florida Subrogation Case law firms use similar, factory-like organizational structures to conduct their high-volume subrogation collections using mostly non-lawyer employees.

42.    With regard to its substantial subrogation business, the Law Firm has a Data Entry department to receive and process new cases transmitted electronically from its insurance company clients, including those from State Farm. Along with that transmittal packet is information about the alleged debtor-driver's insurance.

43.    Based on the information received from the insurer client, a form demand letter is generated and forwarded for signature to a Law Firm attorney.

44.    Until recent changes to its practices in response to Judge Corrigan's rulings in *Sanchez*, and without regard for whether the driver had the required insurance coverage at the time of the accident, that form letter included the following threatening language: "We may seek to suspend your driver's license and registration" if the demanded amount is not paid. Based on information and belief, State Farm's other subrogation firms used and still use similar written threats as a routine element of their collection practices.

45.    That form letter was routinely prepared and sent to the alleged debtor-driver even where the individual had the statutorily-required minimum insurance coverage at the time of the accident.

46.    If the subrogation amount is not satisfied in full, the case is forwarded to a separate unit of non-lawyers to draft a complaint for forwarding to a Law Firm attorney for signature.

47.    Where the debtor-driver has insurance, as is the case for Plaintiffs and the Class, the debtor-driver's insurer has a "duty to defend," which is a duty to hire an attorney to appear in the litigation on behalf of the debtor-driver. Typically, the Subrogation Cases are filed in a Florida County Court, and they are immediately sent to mediation either by court order or by agreement of the parties.

48.    It is the Law Firm's practice to settle Subrogation Cases, including State Farm's Subrogation Cases, at mediation with an agreement that (1) requires that the debtor-driver's insurer tender payment under the policy; and (2) that the debtor-driver pay a set amount per month toward an agreed amount that is less than the full subrogation claim. But the agreement also provides that if the debtor-driver fails to make the required payments at any time, the Law Firm may enter judgment against the debtor-driver for the full subrogation claim plus attorney's fees, costs, and interest. This type of settlement was initially entered into by Mr. Waters and Ms. Sangfield as well as many members of the Class.

49.    However, the payment plans are often for a period of 5-10 years and the debtor-driver's often miss a payment at some point. When this happens, State Farm obtains a judgment against the debtor-driver, like Mr. Waters and Ms. Sangfield.  For cases that proceed to judgment, the Law Firm has a Recovery Department that is assigned the task, among others, of generating the communications necessary to cause the suspension of the debtor-driver's license and registration.

50.    Up until the Law Firm's recent changes instituted in response to the *Sanchez* litigation, and acting with the approval or instruction of State Farm, the Law Firm's Recovery Department would, as part of its usual and common practice, send the debtor-driver a "warning letter" that included language threatening to notify the Department of Motor Vehicles about the unpaid judgment and request suspension of the debtor-driver's driving and registration privileges if the judgment was not paid in full.  This letter would be routinely sent without regard for whether the driver had the statutorily-required insurance at the time of the accident nor whether Defendants had received some or all the debtor-driver's insurance coverage. Upon information and belief, at State Farm's direction or with State Farm's knowledge, State Farm's other Subrogation Case law firms employ similar threats, whether or not the driver had the statutorily-required insurance at the time of the accident.

51.    As organized and directed by Defendants Ricke and Hiday, it was the usual and common practice of the Law Firm to seek suspension of debtors-driver's driving privileges even when it knew (a) that the debtor-driver had the statutorily-required minimum insurance coverage at the time of the accident and/or (b) the debtor-driver's insurer had already paid or agreed to pay, toward a judgment, a portion of or the entire required minimum coverage amount, and/or (c) the debtor-driver's insurer was obligated to pay the judgment but failed to do so through no fault of the debtor-driver (*See* Fla. Stat. 324.121(b)).

52.    As part of this usual and common practice to misuse the statutory scheme and to mislead both judgment debtors and the Department of Motor Vehicles, Defendants sent judgment debtors a letter threatening driver's license suspension and the imposition of SR22 insurance requirements, stating:

> Soon we will notify the State of this unpaid claim and request that they suspend your driving and registration privileges. If your license is suspended, you may be required to carry SR22 insurance.

> Contact our office immediately at 877-235-0060 to avoid suspension of your license.

Upon information and belief, at State Farm's direction or with State Farm's knowledge, State Farm's other subrogation firms employ similar threats.

53.    When Defendants unlawfully suspend an insured debtor-driver's license, the DMV suspension automatically triggers a requirement under Fla. Stat. § 324.151 that the debtor-driver must carry what is known as "SR22" insurance for a

17

period of three years. This requirement should never apply to debtor-drivers that carried the statutory minimum coverage. However, because State Farm and its various subrogation law firms hide from the DMV the fact that the judgment debtor-driver was properly insured when seeking to have their license suspended, the DMV also requires these insured debtor-drivers to carry SR22 insurance for a period of three years at a substantial additional cost of about $150 per month. In fact, many insurance companies will not offer to cover a driver that must carry SR22 insurance because they are considered high risk.

54.    According to State Farm's website, "[a]n SR22 verifies that an individual has vehicle insurance that meets the coverage required by the state for reinstatement of driving privileges." State Farm's website goes on to explain that "SR22 is usually associated with: (1) multiple traffic offenses; (2) DUIs, DWIs or other serious moving violations, or (3) violations for failure to maintain the mandatory insurance coverage required in your state."[1]

55.    As part of this usual and common practice to misuse the statutory scheme and to mislead both judgment debtors and the Department of Motor Vehicles, after a subrogation judgment is entered, the Recovery Department, or other employees of the Law Firm, are directed to send to the Department of Motor Vehicles a form letter referencing that judgment, and stating:

---

[1] https://www.statefarm.com/simple-insights/auto-and-vehicles/suspended-drivers-license-you-may-need-an-sr22

The above-referenced defendant is not making payments towards this debt, and we would appreciate your taking the necessary steps to suspend the driving and registration privileges of the above mentioned defendant for the life of the unsatisfied judgment or until suitable payment arrangements are made.

Upon information and belief, at State Farm's direction or with State Farm's knowledge, State Farm's other Subrogation Case law firms make similar representations to the DMV under such circumstances.

56.     According to Florida law, as interpreted by the Office of the Florida Attorney General since 1958, and by Judge Corrigan's March 2023 Order, this request should never be sent in connection with properly insured debtor-drivers.

57.     As part of its license suspension scheme and to mislead both debtor-drivers and the DMV, Defendants' suspension requests cause debtor-drivers to be flagged for SR22 insurance despite Defendants knowing that the debtor-driver was properly insured.

58.     As a part of its usual and common practice, after a debtor-driver's license has been successfully suspended, the Law Firm and State Farm send a communication informing the debtor-driver of the suspension and advising the debtor-driver that they may contact the Law Firm (not the DMV) for reinstatement, stating:

Re: State Farm Mutual Auto Insurance Company

The Court has now entered a Final Judgment against you. This Judgment has been recorded and is a lien on all of your non-exempt personal property.

Additionally, pursuant to Florida Statute 324.121(1), we have now suspended your driving and registration privileges and you are no longer permitted to drive on the streets of this State.

If you would like your license reinstated you have to complete the attached form fax it back to 904-606-0128, email it to jvance@hidayricke.com or mail it to our office ASAP and call us to work out an arrangement.

Upon information and belief, State Farm's other subrogation firms employ similar collection communication practices, with State Farm's knowledge or based on State Farm's instructions.

59.    As a part of its usual and common practice, when a debtor-driver calls the number listed in the Law Firm letter, a Law Firm non-lawyer employee answers the phone and demands that the debtor-driver make a substantial "down payment" towards their balance and agree to enter an agreement to pay a monthly amount in order to have their license reinstated by the Law Firm.

60.    As a part of its usual and common practice, if the debtor-driver misses a payment, the Law Firm starts the suspension process all over again, sometimes resulting in several suspensions on the same judgment for the same debtor-driver over the course of several years.

61.    Upon information and belief, State Farm's other subrogation firms use similar practices regarding payment agreements and subsequent, repeat suspensions,

without regard for whether the defendant had the required insurance at the time of the accident.

### E.    Mr. Waters' Facts

62.    After graduating high school in 2012, Mr. Waters joined the United State Marine Corps where he held the rank of corporal and was a combat engineer.

63.    On November 16, 2016, Mr. Waters had just returned to Port Charlotte, Florida from Marine Barracks in Washington, D.C. when he was involved in a motor vehicle accident with a vehicle owned by a driver that was insured with State Farm.

64.    At the time of the crash, Mr. Waters was insured by a contract of insurance through USAA Auto Insurance ("USAA"). USAA provides insurance coverage to military members and their families.

65.    Mr. Waters' USAA policy was consistent with the required 10/20/10 minimum insurance requirements under Florida law.

66.    Upon information and belief, USAA provided Defendants with the necessary insurance disclosures establishing that, at the time of the crash, Mr. Waters was properly insured up to the 10/20/10 minimum insurance requirements of Florida law.

67.    State Farm paid for the damages to its insured's vehicle with the intent of enforcing its right of subrogation against Mr. Waters.

68.     State Farm hired the Law Firm to file a subrogation lawsuit against Mr. Waters seeking damages equal to the amount of property damages paid by State Farm to repair its insured's vehicle.

69.     Before filing the subrogation lawsuit, Defendants had knowledge of Mr. Waters' USAA policy and conducted settlement discussions with USAA directly.

70.     On May 3, 2017, the Law Firm sent Mr. Waters a letter demanding $25,084.60 and noting that Mr. Waters was either "not insured" or Mr. Waters "insurance company is refusing to pay." In addition, the Law Firm stated that it may "suspend [Mr. Waters'] driver's license and tag registration."

71.     On November 28, 2017, the Law Firm filed a subrogation lawsuit against Mr. Waters.

72.     Upon information and belief, USAA received notice of the subrogation lawsuit and, pursuant to its duty to defend under the policy, retained Thomas Kane, of Banker Lopez Gassler, P.A., to represent Mr. Waters.

73.     On July 17, 2018, State Farm mediated with Mr. Waters and reached a negotiated settlement of $8,900.00 to be paid from Mr. Waters and USAA to State Farm.

74.     Despite Mr. Waters having the requisite 10/20/10 minimum coverage, which included $10,000 in property damage, State Farm on behalf of its insured

(through the Law Firm) and Mr. Waters (through USAA's counsel) negotiated an agreement whereby USAA would only pay $7,900 of the $8,900 settlement amount. The remaining $1,000 (the amount of his deductible) was to be paid by Mr. Waters under the stipulation.

75.    After exiting the military, Mr. Waters was unemployed for a short period while awaiting disability payments as a result of an injury he sustained in the military, and he was unable to make payments to State Farm under the stipulation.

76.    On October 22, 2018, State Farm entered judgment against Mr. Waters in the amount of $1,947.00, nearly double the amount owed under the stipulation.

77.    On November 6, 2018, the Law Firm sent a letter threatening suspension of Mr. Waters' driver's license. (A copy of the Law Firm's November 6, 2018 letter is attached as **Exhibit 1**).

78.    In 2018, after a period of unemployment following his military service, Mr. Waters secured a job with the City of Cape Coral Utilities (the "City").

79.    Mr. Waters started as a laborer earning $14 per hour, but was quickly promoted to Machine Operator earning $24 per hour. As a Machine Operator, Mr. Waters was responsible for driving the City truck to repair water lines. To secure the promotion, Mr. Waters was required to and did obtain his Commercial Driver's License ("CDL").

80.    On January 25, 2019, the Law Firm's non-lawyer employee, Linda Gleason, sent a letter to Mr. Waters stating that judgment had been entered and his license had been suspended by the Law Firm (not the DMV) and that Mr. Waters should contact the Law Firm to get his license reinstated. (A copy of the Law Firm's January 25, 2019 letter is attached as **Exhibit 2**).

81.    Because of Mr. Waters' driver's license suspension, Mr. Waters also lost his CDL, resulting in his demotion. The City permitted Mr. Waters to stay on with his crew, but he was no longer permitted to operate any City vehicles. The demotion brought Mr. Waters compensation back to $14 per hour.

82.    As a result of his demotion and revocation of his CDL, Mr. Waters was also removed from on-call duty with the City. Prior to having his license suspended, Mr. Waters was eligible to work up to 120 hours of overtime work, including in the aftermath of a hurricane or natural disaster. During the on-call duty, Mr. Waters earned $48 per hour.  Mr. Waters was unable to take this work without a license.

83.    Mr. Waters was forced to ask his god-father and his girlfriend to drive him to and from work. Failing that, Mr. Waters took Uber or Lyft to make it to work paying out of pocket each time.

84.    Shortly after his demotion, Mr. Waters was forced to resign from the City as a result of his suspended driver's license and inability to get to and from work reliably.

85.     Upon information and belief, at some point between 2019 and 2021, Mr. Waters got his license back for a period and regained his employment with the City.  However, in order for the Law Firm to agree to send a letter to the DMV allowing his reinstatement, Mr. Waters was required to make a substantial down payment to the Law Firm and agree to make monthly payments of $100 per month. Mr. Waters's failure to make these agreed upon monthly statements would result in another license suspension.

86.     During this time, Mr. Waters was required to carry SR22 insurance, which cost him an additional $121 per month for a total cost of $1,452 per year in additional auto insurance obligations.

87.     In the fall of 2021, Mr. Waters also secured his dream job as a part-time football coach at his alma mater, Charlotte High School.  This job was in addition to his full-time job with the City.

88.     To fulfill his duties as an assistant football coach, Mr. Waters had to commute to and from the high school, attend games, and all other required team activities.

89.     In approximately January of 2022, Mr. Waters sustained a work place back injury while working with the City. This injury forced him out of work yet again and he was unable to make regular payments to the Law Firm.

90.    On February 16, 2022, the Law Firm sent a letter to Mr. Waters threatening suspension of his driver's license again for failure to make monthly payments under his prior agreement with the Law Firm. (A copy of the Law Firm's February 16, 2022, letter is attached as **Exhibit 3**).

91.    On April 14, 2022, the Law Firm's non-lawyer employee sent another form letter to the DMV requesting that the DMV suspend Mr. Waters driver's license. (A copy of the Law Firm's April 14, 2022 letter is attached as **Exhibit 4**).

92.    On April 28, 2022, the DMV responded to the Law Firm's letter confirming that Mr. Water's license had been suspended and that the suspension would go into effect on May 9, 2022. (A copy of the April 28, 2022 letter from the DMV to the Law Firm is attached as **Exhibit 5**).

93.    On May 25, 2022, Mr. Waters contacted the Law Firm by phone to get his license reinstated so that he could return to work with the City. The Law Firm demanded that Mr. Waters enter into another agreement which required a $300 "down payment" followed by $100 monthly payments thereafter. This new agreement was again secured by his drivers' license as failure to make payments would result in suspension. At this time, the Law Firm refused to give Mr. Waters a payoff amount. The Law Firm memorialized its demand and subsequent agreement in a letter, which stated:

> This is to confirm you have agreed to pay $300.00 by Thursday, May 26, 2022 and $100.00 per month thereafter by the 26th day of each

month beginning Sunday, June 26, 2022. Upon receipt of your down payment in certified funds, we will issue a letter consenting to the reinstatement of your driving privileges, in so far as the judgment had the same effect. This arrangement will expire on 5/25/2023 unless you have contacted this firm and negotiated larger payments before that deadline. Your balance will continue to accrue interest in accordance with Florida Statutes.

. . .

The law firm of Hiday & Ricke, P.A, does not provide monthly balance or billing statements, payment booklets, or confirmation of received payments. It is your responsibility to make sure payments are received on time and to keep a record of the monthly balance.

A copy of the Law Firm's May 25, 2022 letter to Mr. Waters is attached as **Exhibit 6**).

94.     On May 25, 2022, Mr. Waters made a down payment of $300 to the Law Firm via credit card.

95.     On May 27, 2022, the Law Firm sent a letter to the DMV advising that Mr. Waters had made arrangements for payments and that the DMV could reinstate his driver's license. This document is titled "Judgment Consent Form." (A copy of the Law Firm's May 27, 2022 letter to the DMV is attached as **Exhibit 7**).

96.     On June 7, 2022, Mr. Waters paid the Lee County Tax Collector $190 to reinstate his driver's license. Mr. Waters was, again, required to obtain and pay for SR22 insurance coverage for three years from the date of this new suspension.

97.    From June 2022 through October 2022, Mr. Waters paid Defendants a total of $600 in monthly payments under his agreement with the Law Firm in order to keep his license.

98.    However, on or about December 2023, Mr. Waters missed a monthly payment to the Defendants. At this time, Mr. Waters was still awaiting approval of his veteran's disability income.

99.    On February 1, 2023, the Law Firm asked the DMV to suspend Mr. Waters' driver's license for a third time. In connection with the third suspension, the Law Firm's non-lawyer employee wrote to Mr. Waters "resuspending" his license and demanding a lump sum payment as follows:

On Wednesday, February 1, 2023, 2:25 PM, Jennifer Vance <jvance@hidayricke.com> wrote:

Good afternoon,

   Since you've failed to pay as agreed & respond to communications, your payment arrangement is now terminated & your license is being resuspended as we speak. To reinstate you'll have to make a lump sum offer on the remaining balance.

Jennifer M. Vance

Subrogation Specialist

Hiday & Ricke P.A

P.O. Box 550858

Jacksonville, FL 32255

ph.#: 904-606-0240 EXT :182

fax#: 904-363-0538

**HIDAY & RICKE, P.A.**
FLORIDA'S PREMIER COLLECTION FIRM
ATTORNEYS AT LAW

100.   On February 7, 2023, Mr. Waters called the Law Firm to ask if they would accept $1,000 (the initial amount of the difference between State Farm's demand and what Mr. Waters' insurer failed to pay even though he had the required insurance coverage) as final payment and to stop suspending his driver's license.

101.   The same day the Law Firm's non-lawyer employee, Ms. Vance, emailed Mr. Waters saying the following:

Good afternoon,

    My client has accepted your $1k offer to settle the remainder of the file in full. However, there's a default clause. If you do not pay the $1k settlement as agreed, the only way you'll be able to reinstate your license will be to pay the full balance remaining. Which will increase over time due to interest. The $1,000.00 must be received no later than 3/08/2023.


Jennifer M. Vance

Subrogation Specialist

Hiday & Ricke P.A

P.O. Box 550858

Jacksonville, FL 32255

ph.#: 904-606-0240 EXT :182

fax#: 904-363-0538



102.   On February 17, 2023, the DMV sent a letter to the Law Firm confirming that it had again suspended Mr. Waters' driver's license. (A copy of the DMV's February 17, 2023 letter to the Law Firm is attached as **Exhibit 8**).

103.   Mr. Waters begged his family members to give him a loan to pay off the Defendants in order to stop the repeated unlawful suspensions of his driver's license. Mr. Waters' father ultimately agreed to give him a $1,000 loan on the condition that Mr. Waters make monthly payments to his father.

104.   On March 16, 2023, Mr. Waters called the Law Firm to make the $1,000 payment over the phone and was told by the Law Firm's non-lawyer employee that the previous acceptance of his $1,000 payment offer had expired and Mr. Waters must now pay approximately $2,000 to stop the license suspensions.  Mr. Waters did not have $2,000 to pay to the Law Firm.

105.   On March 21, 2023, Judge Corrigan entered an Order Granting in part Plaintiff's Motion for partial Summary Judgment in *Sanchez*.  This Court held in *Sanchez* that when the Law Firm requested suspension of a properly insured driver's license, "Hiday & Ricke's actions were in contravention of the statute".

106.   Despite this Court's ruling, Defendants did not stop suspending licenses nor did they take steps to reinstate the wrongfully suspended licenses of properly insured drivers, like Mr. Waters.  Instead, they continued to utilize the license suspension scheme to extort payments.

107.   Because he was unable to work to earn the $2,000 now demanded by the Law Firm, Mr. Water's license remained suspended for a period of approximately six months between February 17, 2023 and August 7, 2023.

108.    In the winter of 2023, Mr. Waters was asked to interview for the football head coaching position at Sarasota Christian, nearly 45 minutes from his home. Mr. Waters took an Uber to the interview. Although the job offer was made to him by Sarasota Christian, Mr. Waters was forced to turn down the coaching job as well as two other coaching jobs that required a commute because he would not be able to meet his obligations without a driver's license. Mr. Waters continued to serve as a part-time football coach at Charlotte High.

109.    In August 2023, Mr. Waters convinced his father to give him a larger loan. This time, Mr. Waters asked for whatever was necessary to pay off Defendants. After some phone discussions, the Law Firm's non-lawyer employee ultimately accepted on State Farm's behalf $1,623.82 as Mr. Waters' final lump-sum payment.

110.    Upon information and belief, after payment was made the Law Firm sent a final letter to the DMV allowing it to reinstate Mr. Waters' wrongfully suspended driver's license. This letter would have been substantially similar to the one sent on May 27, 2022. *See* **Exhibit 7**.

111.    On August 7, 2023, Mr. Waters paid the Lee County Tax Collector a $265 reinstatement fee as a result of the unlawful suspend and reinstatement.

112.    On August 24, 2023, the Law Firm recorded a satisfaction of judgment.

113.    As a direct result of Defendants' unlawful conduct and repeated driver's license suspensions, Mr. Waters' paid Defendants at least $2,463.82. This

sum was paid in addition to Mr. Waters' insurer, USAA, paying Defendants $7,900.00.

114.    As a direct result of Defendants' conduct, Mr. Waters paid the DMV (through the Lee County Tax Collector) approximately $455 in driver's license reinstatement fees that should never have been assessed because he was properly insured at the time of the accident.

115.    As a direct result of Defendants' illegal license suspension conduct, Mr. Waters lost his City promotion and then lost his City job altogether, resulting in lost income and drastically limiting his future earning capacity.

116.    As a direct result of Defendants' conduct, Mr. Waters lost the opportunity to advance in his high school football coaching career and was forced to stay at a lesser position close to his house.

117.    As a direct result of Defendants' conduct, Mr. Waters was forced to spend money on Uber and Lyft to commute to and from work and fulfill his family obligations, including caring for his children.

118.    As a direct result of Defendants' conduct, Mr. Waters was forced to pay for an SR22, which costs $50 to file, and resulted in a significant auto insurance premium increase of at least $1,400 per year. Mr. Waters' is currently paying for SR22 insurance and has paid for it for at least 31 months.  Because he was properly insured at the time of the crash, he should never have had to pay for an SR22.

119.   Because Mr. Waters was properly insured at the time of the November 16, 2016 automobile collision, Mr. Waters was never legally subject to having his driving privileges suspended pursuant to Florida Statutes § 324.051(2)(b)(1) and has suffered significant actual damages as a result.

### F.    Ms. Sangfield's Facts

120.   Ms. Sangfield is a single mother to three children who works as a medical technician.

121.   On February 26, 2016, Ms. Sangfield was in a motor vehicle collision with a State Farm-insured driver. Ms. Sangfield was driving a vehicle that included her fathers name on the title.

122.   At the time of the collision Ms. Sangfield was properly insured by a contract of insurance through Geico Insurance Agency, Inc ("Geico").

123.   Ms. Sangfield's Geico policy was consistent with the required 10/20/10 minimum insurance requirements under Florida law.

124.   Geico provided Defendants with the necessary insurance disclosures establishing that, at the time of the crash, Ms. Sangfield was properly insured up to the 10/20/10 minimum insurance requirements of Florida law.

125.   State Farm paid for the damages to its insured's vehicle with the intent of enforcing its right of subrogation against Ms. Sangfield.

126.   State Farm hired the Law Firm to file a subrogation lawsuit against Ms. Sangfield seeking damages equal to the amount of property damages paid by State Farm to repair its insured's vehicle.

127.   Before filing the subrogation lawsuit, Defendants had knowledge of Ms. Sangfield's Geico policy and conducted settlement discussions with Geico directly.

128.   On November 27, 2017, the Law Firm filed a complaint alleging that Ms. Sangfield owed State Farm, as subrogee of Timothy Hauck, a total sum of $23,203.79 for property damage to his vehicle.

129.   On January 18, 2018, Defendants received the full $10,000 payment for property damage coverage from Geico.

130.   On April 12, 2018, Defendants conducted a mediation with Ms. Sangfield. Ms. Sangfield entered into an agreement with Defendants where she agreed to pay $7,200 to the Defendants at $120 per month. However, if Ms. Sangfield missed a payment, then Defendants would enter judgment against Ms. Sangfield for $14,203.79.

131.   From June 2018 through February 2020, Ms. Sangfield made monthly payments of $120 totaling $2,400.

132.   Starting on or about March 1, 2020, Ms. Sangfield was financially unable to make her $120 monthly payments to the Defendants.

133.    On September 29, 2020, Defendants filed to have a judgment entered against Ms. Sangfield for $13,510.38 with the intention of using the judgment to illegally seek suspension of Ms. Sangfield's driver's license and use the suspension as leverage for additional payments.

134.    On October 9, 2020, the Law Firm's non-lawyer employee, Jennifer Vance emailed Ms. Sangfield saying the following:

---

To:        shana0502@yahoo.com
Subject:   File - 201703616

Good afternoon,
    I'm reaching out regarding the final judgement that was entered against you in the amount of $13,510.38. I'm the agent that will be handling your file. To avoid suspension of your license you can either offer a settlement or enter into a payment arrangement with a down payment of $600.00 and $100.00 monthly. This amount is for both you and your husband. Or you can have separate payment arrangements. That's up to you. Please let me know how you'd like to proceed. Thank you,

Jennifer M. Vance
Subrogation Specialist
Hiday & Ricke P.A
P.O. Box 550858
Jacksonville, FL 32255
ph.#: 904-606-0240 EXT :182
fax#: 904-363-0538

**HR** FLORIDA'S PREMIER COLLECTION FIRM
**HIDAY & RICKE, P.A.**
ATTORNEYS AT LAW

*This is an attempt to collect a debt and anything obtained will be used for that purpose*

---

135.    On October 15, 2020, Defendants sent Ms. Sangfield a letter stating the following:

Re:    Our Client:   State Farm Mutual Automobile Insurance Company as Subrogee of Timothy
        Hauck
        Kashana Odessa Sangfield
        License Number:  S521-514-78-662-0
        Date of Birth:  May 2, 1978
        Our file:  201703616

### Warning

Dear Kashana Odessa Sangfield:

Soon we will notify the State of this unpaid claim and request that they suspend your driving and registration privileges.  If your license is suspended, you may be required to carry SR22 insurance.

**Contact our office immediately at 877-235-0060 to avoid suspension of your license.**



Hiday & Ricke, P.A.

136.   Defendants were aware that SR22 insurance is only required for persons driving without any insurance, and that therefore Ms. Sangfield should not have been subject to the SR22 requirements because Ms. Sangfield never drove her vehicle uninsured and Defendants had already received the full amount of insurance coverage required by Florida law.

137.   On October 30, 2020, in response to Defendants' letter threatening suspension of her license and imposition of SR22 insurance, Ms. Sangfield called the Law Firm to ask if she could make a payment to avoid suspension. The Law Firm's non-lawyer employee advised that Ms. Sangfield should make a down

payment of $200 and then the Law Firm would hold off on suspending her driver's license. Also on October 30, 2020, Ms. Sangfield made a payment of $200, which was all the money that she had at the time to try to keep her license. As a result, the Law Firm did not make good on its threat to suspend her driver's license.

138.    On or about November of 2020, Ms. Sangfield missed another monthly payment to the Defendants.

139.    On January 8, 2021, Defendants sent Ms. Sangfield a second letter stating again that they would seek suspension of her driver's license and imposition of SR22 insurance unless immediate payment was made.

140.    Upon information and belief, on July 22, 2021, with knowledge that Ms. Sangfield was properly insured at the time of the accident, Defendants sent a letter to the DMV requesting that it suspend Ms. Sangfield's driver's license. The form of the letter sent to the DMV requesting suspension of Ms. Sangfield's driver's license was identical to the one sent for Mr. Waters in Exhibit 4.

141.    During the holidays, Ms. Sangfield worked night shifts at the post-office sorting mail at the warehouse. Ms. Sangfield worked this job in addition to her day job as a medical technician to try to support her three children.

142.    In January of 2022, Ms. Sangfield's supervisor at the post office approached her with a job offer to become a full-time mail carrier for the post office. The position would pay $22 per hour with opportunities for overtime, healthcare,

retirement benefits, and other benefits that Ms. Sangfield did not have as a medical technician, but desperately needed.

143.   Ms. Sangfield earned only $15 per hour at the time as a medical technician.

144.   However, in January of 2022, Ms. Sangfield's license was suspended as a result of the Defendants' illegal scheme and she could not accept the post office position without a driver's license.

145.   On or about January 31, 2022, Ms. Sangfield was in school at Pensacola State studying to become an EKG technician to earn more money to support her family, her mother's health was deteriorating, and her three children needed her to drive them. Ms. Sangfield had been relying on her cousins and father to care for her family and drive her to school and work as a result of Defendant's unlawful suspension of her license. Ms. Sangfield contacted the Law Firm and begged them to reinstate her license writing the following email to the Law Firm's non-lawyer employee, Jennifer Vance:

> I greatly apologize. I'm at work and was rushing. My current address is 720 Fairfax Drive, Pensacola, Florida 32503. I am on food stamps and get $523/mo for my children and I. This is how we receive our health insurance (Medicaid). As far as the offer, I don't have a down payment today but you told me to complete it and send it in to you anyways. With me working part time, fighting child support, going to school and trying to pay the couple of bills I do have is an absolute struggle, which will all be over soon. Being a single parent, a caregiver and trying to help my parents is why I desperately need my driver's license because so many people depend on me and I'm only one person. I could try to

pay $40/ mo until I graduate school in May. Please let me know if you need any additional information.

146.    On February 1, 2022, the Law Firm's non-lawyer employee wrote back to Ms. Sangfield with a demand for greater payment and a threat to have Ms. Sangfield's father's license suspended, as well:

> I understand your situation but I need you to remember that this payment arrangement is to reinstate your license and keep your father's license valid. I told you to fill out the form & put some type of an offer on the last page. You left it blank. I also told you that due to your payment history there would have to be some type of a down payment. Whatever that may be, I just need a number. I read you're offering $40/month. But there has to be some type of a down payment. If you read the form you filled out, you'll see the usual down payment to reinstate is 33%. We lowered that to 10%. Just so you know what I'm up against to try & get this approved for you. I need you to know that if you default on this new payment arrangement you will have a 10% down payment & there will be nothing I can do about that. In the offer field, specify that you're offering $__ for down payment & $40/month. And that you'll increase in May after your graduation.

147.    Ms. Sangfield was terrified of the Law Firm suspending her father's driver's license because she relied on her father for transportation to and from work and to care for her children. Ms. Sangfield's father's license should never have been in jeopardy because Ms. Sangfield had the statutory minimum insurance at the time of her accident. Defendants had told Ms. Sangfield that they could seek suspension of her father's license as well as hers because he was on the title of the vehicle.

148.    Also on February 1, 2022, Ms. Sangfield responded to Ms. Vance's demand with the following:

Yes ma'am. I totally understand if I default on this new arrangement that I will have a 10% down payment. I just desperately need my license. I currently have a friend that "said" she is going to try to help me with some kind of down payment, I just don't have it at the moment. Once I get a down payment, I will submit for payment. Please be mindful, that after graduation and taking my state NHA certification exam, I would need just a little time for new job placement. I promise to keep in contact and keep you informed as to what is going on. Sorry for the late response. Have been in class all day and will be starting 12hr clinicals in the hospital tomorrow. Having this email correspondence with you is the best for me. Thank you for all that you're trying to do to help me get my license reinstated.

149.    On or about May 5, 2022, Ms. Sangfield called back to request the amount of a down payment and the Law Firm's non-lawyer employee, Jennifer Vance replied with the following demand:

I spoke with the client regarding your offer of $500.00 down payment & $40.00/month. The client is requesting the past due balance as a down payment, which in this case would've been $1k. But I've asked them to accept $640.00 as a down payment instead. They are requesting $50.00/month. Please advise if you'd like to accept this offer to reinstate your license. I know I said it before, I just have to reiterate, if you're going to be late, please call me BEFORE you miss your payment. That's the only way I can help you.

150.    The Law Firm utilized the illegal suspension of Ms. Sangfield's driver's license to threaten her ability to support her family, threaten her father's driver's license, and force her into a new agreement which included a substantial down payment followed by additional monthly payments and secured by threat of license suspension.

151. Due to her financial circumstances, Ms. Sangfield was unable to come up with the "down payment" demanded by the Law Firm until August 31, 2022.

152. On August 31, 2022, Ms. Sangfield agreed to accept Defendant's offer and paid $240 towards the required Down Payment and on September 9, 2022 she paid the remaining $400 lump sum "Down Payment" by separate agreement with Defendants in order to get her driver's license reinstated. In addition, Ms. Sangfield agreed to pay $50 per month to keep her license from being suspended again.

153. On September 21, 2022, the Law Firm sent a letter to the DMV stating that Ms. Sangfield had made payment arrangements with them and that the DMV should reinstate her license. The format of the Law Firm's letter to the DMV informing them that Ms. Sangfield entered a payment plan and that her driver's license may be reinstated was identical to the "Judgment Consent Form" sent for Mr. Waters in Exhibit 7.

154. After agreeing to a down payment and payment plan, Ms. Sangfield went down to the DMV to get her driver's license back. When Ms. Sangfield arrived, she was told that she had to show proof of SR22 insurance to have her driver's license reinstated.

155. Ms. Sangfield solicited multiple quotes and was told that the auto insurance premium, including SR22, would be over $400 per month. In the past, Ms. Sangfield's auto insurance had never been more than $200 per month. Due to her

limited income and family expenses, Ms. Sangfield simply cannot afford the additional cost of SR22 insurance. As a result, her license continues to be unlawfully suspended as a result of Defendants' unlawful license suspension scheme.

156. From August 31, 2022 through the filing of this complaint, Ms. Sangfield has made 16 consecutive monthly payments of $50 under her new agreement with Defendants which is secured by her driver's license.

157. Despite being on a payment plan, Ms. Sangfield cannot reinstate her driver's license because she cannot afford to pay the costly SR22 insurance, that never should have been imposed upon her at all since she was properly insured at the time of her accident.

158. On March 21, 2024, Ms. Sangfield again solicited a quote for car insurance and received a quote from Progressive Insurance for $426.55 per month with SR22 insurance. Ms. Sangfield cannot afford to pay this monthly amount and therefore continues to be unable to drive as a result of Defendants' wrongful suspension scheme.

159. On Tuesday March 12, 2024, Ms. Sangfield requested the balance remaining on her $13,510.38 judgment debt and received the following response:

On Tuesday, March 12, 2024, 8:10 AM, Jennifer Vance <jvance@hidayricke.com> wrote:

Good morning Ms. Sangfield,

   Your remaining balance on file is $13,697.64. You can offer a lowered lump sum at any time by calling or emailing me with your offer. If there's anything else you need, I'm in the office today. Please feel free to reach out.

Jennifer M. Vance

Subrogation Specialist

Hiday & Ricke P.A

P.O. Box 550858

Jacksonville, FL 32255

ph.#: 904-606-0240 EXT :182

fax#: 904-363-0538



160.   After having her driver's license unlawfully suspended for nearly 3 years and making payments to the Defendants of $4,620 towards her balance, Defendants claim that Ms. Sangfield owes $187.56 more than she did when she started.  But for the suspension of her license and the threat to suspend her father's license as well, Ms. Sangfield would not have made payments towards this debt as her income level is so low that such payments are a significant hardship on her family and she is exempt from garnishment and other collection efforts due to her extremely low-income level.

161.   Ms. Sangfield's driver's license remains suspended today because of the Defendants' illegal and inaccurate reporting to the DMV that Ms. Sangfield operated her vehicle without insurance.

162.   As a direct result of Defendants' unlawful conduct and license suspensions, Ms. Sangfield paid Defendants $4,620. This sum was paid in addition to Ms. Sangfield' insurer, Geico, paying Defendants $10,000 towards the damaged vehicle.

163.   As a direct result of Defendants' conduct, Ms. Sangfield was forced to rely on her cousins and her father to drive her to work, her children to school, and she was unable to care for her elderly mother.

164.   As a direct result of the Defendants' conduct, Ms. Sangfield was unable to accept a job as a mail carrier for the post office and was unable to receive the increased compensation and benefits.

165.   Because Ms. Sangfield was properly insured at the time of the February 26, 2016, automobile collision, Ms. Sangfield was never legally subject to having her driving privileges suspended pursuant to Florida Statutes § 324.051(2)(b)(1) and Defendants conduct in suspending her license were wholly unlawful.

## V.    **Class Representation Allegations**

166.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23, on behalf of

themselves and a class ("the Class") defined as follows: 2

> All persons who (a) on or after April 7, 2017, (b) were sent a letter by
> a law firm on behalf of State Farm substantially similar to Exhibit  1 to
> this Complaint and/or Exhibit 2 to this Complaint, (c) with regard to
> collection of a judgment debt, and (d) where the debtor was insured as
> required by Fla. Stat. § 324.021(7) at the time of the accident.

167.    Plaintiffs also seek certification of the following Subclass ("the Hiday

& Ricke Subclass"):

> All persons who (a) on or after April 7, 2017, (b) were sent a letter by
> Hiday & Ricke at the direction of an insurance company other than
> State Farm in substantially the form of Exhibit 1 to this Complaint
> and/or Exhibit 2 to this Complaint, (c) with regard to collection of a
> judgment debt, and (d) where the debtor was insured as required by Fla.
> Stat. § 324.021(7) at the time of the accident.

168.    Plaintiffs also seek certification of the following Subclass ("the FCCPA

Subclass"):

> All persons who (a) on or after April 7, 2019, had their driver's license
> suspended in connection with a State Farm subrogation judgment as a
> result of an auto accident, (b) who carried the statutory minimum
> amount of insurance at the time of the accident, and (c) who made
> subsequent payment arrangements with State Farm which resulted in

---

[2] Because the class action claims in this matter stem from the same conduct
underlying the class action allegations asserted in *Sanchez*, Plaintiffs are entitled to
*American Pipe* tolling of the statute of limitations for all claims asserted herein from
the original filing date in *Sanchez* of April 7, 2021. *American Pipe & Construction
Co. v. Utah*,414 U.S. 538 (1974); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp 1512,
1528–29 (M.D. Fla. June 19, 1989).

the filing of a "Judgment Consent Form" with the DMV substantially similar to Exhibit 7 to this Complaint.

## **Numerosity**

169.   At this time, Plaintiffs do not know the exact number of members of the Class or Subclass; however, given the volume of Defendants' business, there are at least hundreds of members of the Class if not several thousand. Defendants have been engaged in the practices complained of since at least 2007. Thus, the Class is so numerous that joinder of all members is impracticable.

## **Commonality**

170.   There is a common question of law and fact common to Plaintiffs and the members of the Class including:

a.    whether the alleged use of the mails constitutes the predicate act of mail fraud under RICO;

b.    whether Defendants' collection practice of threatening to have debtors' driving privileges suspended under circumstances where such suspension is illegal constitutes the crime of extortion under Florida law;

c.    the extent of Defendant State Farm's direction and participation of the collection practices at issue here;

d.    the extent of Defendants Ricke's and Hiday's direction of and participation in the collection practices at issue here;

e.    whether State Farm agreed to engage Hiday & Ricke with knowledge of Hiday & Ricke's illegal debt collection practices;

f.    whether Defendants committed an abuse of process by seeking to have debtors driving privileges suspended despite knowledge that the debtor had the requisite minimum amount of insurance which precludes such a suspension;

g.    Whether Fla. Stat. § 324.131 precludes judgment creditors, such as Defendants, from requesting that the DMV suspend the driver's licenses of judgment debtors who were properly insured at the time of the accident; and

h.    Whether Defendants engaged in the common law violations complained of and are liable for the damages caused.

## **Typicality**

171.   Plaintiffs' claims are typical of the claims of the Class they seek to represent. Plaintiffs, like members of the Class, had their driving privileges suspended by the Florida DMV after notice was issued by Defendants pursuant to Fla. Stat. § 324.111, despite the fact that Plaintiffs were properly insured. Thus, Plaintiffs' claims, like the claims of the Class, arise out of the same common practices and conduct by Defendants and are based on the same legal and remedial theories.

**Adequacy**

172.   Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions.   Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so.   Neither Plaintiffs nor their counsel possess interests that conflict with the Class they seek to represent.

**Equitable Relief**

173.   The Class meets the requirements for certification to obtain equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory relief with respect to the Class as a whole. Prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants regarding the manner in which they request license suspensions pursuant to Fla. Stat. § 324.111. Additionally, Plaintiffs and members of the class are currently required to carry SR22 insurance as a result of Defendants' unlawful license suspensions. Therefore, injunctive relief is appropriate to require Defendants to take the necessary steps to

inform the DMV that the licenses of Plaintiffs and the class were wrongfully suspended and that therefore the SR22 insurance requirement should be lifted.

## **Predominance and Superiority**

174. The Class also meets the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy for at least the following reasons:

a. Absent a class action, as a practical matter, members of the Class will be unable to obtain redress, Defendants' violations will continue without remedy, and additional consumers will be harmed.

b. It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions.

c. A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

d. The lawsuit presents no difficulties that would impede its management by the Court as a class action.

e.     Defendants have acted on grounds generally applicable to class

members, making class-wide relief appropriate.

## VI.    **Causes of Action**

### COUNT I
### FLORIDA CONSUMER COLLECTIONS PRACTICES ACT ("FCCPA")
#### (Class Action Claim Against All Defendants)

175.   Plaintiffs incorporate paragraphs 1 through 174 as if fully set forth in

this Count.

176.   Plaintiffs assert this count against all Defendants on a class basis for

violations of the Florida Consumer Collections Practices Act ("FCCPA").

177.   The FCCPA class definition for this claim is:

All persons who (a) on or after April 7, 2019, had their driver's license
suspended in connection with a State Farm subrogation judgment as a
result of an auto accident, (b) who carried the statutory minimum
amount of insurance at the time of the accident, and (c) who made
subsequent payment arrangements with State Farm which resulted in
the filing of a "Judgment Consent Form" with the DMV substantially
similar to Exhibit 7 to this Complaint.

178.   The Class Period for this count is two years prior to the date of the

original filing of the Complaint in this matter. Because the class action claims in this

matter stem from the same conduct underlying the class action allegations asserted

in *Sanchez*, Plaintiffs are entitled to *American Pipe* tolling of the statute of

limitations for all claims asserted herein from the original filing date in *Sanchez* of

April 7, 2021. *American Pipe & Construction Co. v. Utah*,414 U.S. 538 (1974);

*Barnebey v. E.F. Hutton & Co.*, 715 F. Supp 1512, 1528–29 (M.D. Fla. June 19, 1989).

179.   FCCPA § 559.55(6) defines "Debt" or "consumer debt" to mean "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." (emphasis added).

180.   If Defendants had only collected on the judgment, without more, they would have avoided FCCPA liability, as tort judgments do not typically fall within the definition of "consumer debt" under the FCCPA. However, each time Defendants forced Plaintiffs or members of the Class into separate obligations involving required "Down Payments" and monthly payments and where these separate agreements were enforced through the continued threat of driver's license suspensions, they converted a simple tort judgment into a "consumer debt." Because one's driver's license is "property" that is used by the driver primarily for personal, family or household use, the monthly payment agreement tied to the debtor's driver's license constitutes a new and separate obligation. And because these new obligations were entered into after the debtor's license was unlawfully suspended and were a condition of obtaining a letter from Defendants to the DMV stating that their driver's license could be reinstated as a result of sufficient payment

51

arrangements having been made, these separate obligations involve more than just a tort judgment and fall within the purview of the FCCPA.

181.   After payment arrangements were made between Defendants and Mr. Waters, Ms. Sangfield, and each member of the FCCPA Class, the Law Firm sent, on behalf of State Farm, a standardized "Judgment Consent Form" to the DMV allowing reinstatement of the debtor's driving privileges because "THE ABOVE DEFENDANT/DEBTOR HAS MADE SATISFACTORY ARRANGEMENTS TO PAY THE JUDGMENT ENTERED IN THE ABOVE NOTED CASE."   The Form goes on to confirm that the debtor's driver's license will continue to be used to secure monthly payments by stating: "THE JUDGMENT CREDTOR REQUESTS THAT ANY RESTRICTIONS UPON THE DRIVING PRIVILEGE, IMPOSED BECAUSE OF THIS JUDGMENT, BE REMOVED AT THIS TIME.  I WILL NOTIFY YOU IN THE EVENT THAT PAYMENTS ARE NOT MADE AS AGREED, SO THAT RESTRICTIONS MAY BE IMPOSED."  Exhibit  7.

182.   The filing of a Judgment Consent Form with the DMV proves that a separate payment obligation was made between State Farm and the debtor (including Mr. Waters, Ms. Sangfield, and the FCCPA Class), and that failure to make continued payments under that separate agreement would result in additional driver's license suspensions.

183.   These Judgment Consent Forms were signed and delivered to the DMV by the Law Firm's non-lawyer employee. **Exhibit 7**.

184.   In relevant part, FCCPA § 559.72 provides:

Prohibited practices generally.  In collecting consumer debts no person shall:

(9)   Claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when such person knows that the right does not exist.

(10)   Use a communication that simulates in any manner legal or judicial process or that gives the appearance of being authorized, issued, or approved by a government, governmental agency, or attorney at law, when it is not.

185.   Defendants routinely violate § 559.72(9) by repeatedly asserting they have the legal right to suspend a properly insured judgment debtor's driver's license for failure to make payments as agreed.

186.   Defendants also routinely violate FCCPA § 559.72(10), which states that no person shall: "[u]se a communication … that gives the appearance of being authorized, issued, or approved by a …governmental agency, … when it is not."

187.   By repeatedly asserting to judgment debtors that their failure to pay as agreed will result in the Florida DMV suspending the driver's licenses of Plaintiffs and the Class, after the DMV had already suspended their licenses at least once, Defendant's actions gave the appearance that the Florida DMV authorized Defendants to make such threats as it suspended their licenses upon request. The fact

that Defendants misled the DMV by failing to disclose that Plaintiffs and the FCCPA Class were properly insured at the time of the accident was never disclosed to Plaintiffs or the Class, and this omission caused the Plaintiffs and the Class members to believe the suspension threats were legitimate when they were not.

188.    As determined by Judge Corrigan's March 2023 Order, the Financial Responsibility Law of 1955 does not permit the suspension of properly insured debtor-driver driver's licenses by Defendants.  Accordingly, all correspondence and monthly payment demands that were made by Defendants under a continuous threat of having the debtor-driver driver's license suspended asserted a legal right that did not exist in violation of § 559.72(9) and gave the appearance that the DMV authorized such suspensions in violation of § 559.72(10).

189.    Because Mr. Waters, Ms. Sangfield, and members of the FCCPA Class were properly insured at the time of the underlying accident, Defendants had no legal basis to assert the legal right to request suspension of driver's licenses, suspend registration, or cause the imposition of SR 22 insurance. Each time they did, they violated Fla. Stat. § 559.72(9) and (10).

190.    Furthermore, Defendants routinely violated § 559.72(9) and (10) when they demanded large "down payments" from Plaintiffs and the Class as a condition of reinstating their driver's licenses. Because Defendants had no legal right to request suspension of the licenses of Plaintiffs and the Class, who were properly

insured, they likewise had no legal right to demand large "down payments" followed by an agreement to make specific monthly payments as a condition of reinstating their driving privileges.

191.   Defendants also violated Fla. Stat. § 559.72(9) and (10) by stating that Plaintiffs and the class would have to pay for "SR22 Insurance" if payment arrangements on the judgment debt were not made. SR22 Insurance is only to be imposed on uninsured drivers under the Financial Responsibility Law. See Fla. Stat. § 324.151. But because the SR22 requirement is automatically placed on the driving record of any suspended driver, this threat appears to be approved or authorized by the DMV, when it is not.

192.   Plaintiffs and the class have suffered concrete harm caused by these violations of Fla. Stat. § 559.72(9) and/or (10) in the form of monetary payments made under an agreement enforced through an unlawful threat of driver's license suspensions.

193.   During the class period, Mr. Waters made several payments to Defendants as a result of Defendants either requesting the suspension of his driver's license or threatening to do so. He would not have made these payments in the manner that he did but for the unlawful threats of license suspensions repeatedly made by Defendants. These illegally coerced payments should be refunded as damages.

194.   During the class period Ms. Sangfield made several payments to Defendants as a result of Defendants either requesting suspension of her driver's license or threatening to request suspension of her or her father's driver's license. Because she was on public assistance at the time and living on an extremely tight budget, these payments were a significant financial hardship on Ms. Sangfield and her family and she would not have made these payments in the manner that she did but for the unlawful threats of license suspensions repeatedly made by Defendants. These illegally coerced payments should be refunded as damages.

195.   The FCCPA Class likewise made payments to Defendants after having their driver's licenses unlawfully suspended.  These payments were only made because Defendants were asserting a legal right they did not have and should be refunded.

196.   Plaintiffs and the FCCPA class should also be awarded statutory damages up to $1,000 per class member or up to 1% of Defendants' net worth, plus attorney fees and litigation costs pursuant to FCCPA Fla. Stat. § 559.77.

## COUNT II
## COMMON LAW CONVERSION
### (Class Action Claim Against All Defendants)

197.   Plaintiffs incorporate paragraphs 1 through 174 as if fully set forth in this Count.

56

198.    Plaintiffs assert this count against all Defendants on a class basis for the tort of Conversion under Florida common law.

199.    The Class Period for this Count begins four years prior to the date of the initial Complaint in this matter. Because the class action claims in this matter stem from the same conduct underlying the class action allegations asserted in *Sanchez*, Plaintiffs are entitled to *American Pipe* tolling of the statute of limitations for all claims asserted herein from the original filing date in *Sanchez* of April 7, 2021. *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp 1512, 1528–29 (M.D. Fla. June 19, 1989).

200.    "[T]o state a claim for conversion, one must allege facts sufficient to show ownership of the subject property and facts that the other party wrongfully asserted dominion over that property." *Edwards v. Landsman*, 51 So. 3d 1208, 1213 (Fla. 4th DCA 2011). The essence of an action for conversion is "not the acquisition of the property of the wrongdoer, but the wrongful deprivation of a person of property to the possession of which he is entitled." *Star Fruit Co. v. Eagle Lake Growers, Inc*., 160 Fla. 130, 33 So. 2d 858, 860 (1948).

201.    "Historically, it was only tangible property that could be converted." *Joe Hand Promotions, Inc. v. Jacobson*, 874 F. Supp. 2d 1010, 1017 (D. Or. 2012). Florida courts now recognize, however, that "[a]ctions for conversion may properly

be brought for a wrongful taking over of intangible interests" as well. *In re Estate of Corbin*, 391 So. 2d 731, 732 (Fla. 3d DCA 1980).

202.   Defendants routinely, deliberately, and collectively served requests on the Florida DMV asking it to take affirmative steps to suspend the driver's licenses of Plaintiffs and the Class. These requests were made with knowledge that Plaintiffs and members of the Class were properly insured under Florida law at the time of the underlying accident. The purpose of these requests was to exercise wrongful dominion and control over the driver's licenses of Plaintiffs and members of the Class and to deliberately and intentionally deprive them of their driver's licenses as well as their right to legally drive a vehicle within the state and to subject them to criminal penalties for doing so.

203.   The intent behind this exercise of dominion over the drivers' licenses of Plaintiffs and the Class was to force them to enter into separate arrangements involving large initial "down payments" followed by a series of monthly payments as a condition to having their license reinstated.

204.   Defendants continued to exercise improper and unlawful dominion and control over the driver's licenses of Plaintiffs and the Class by continuously asserting that missing any single payment would result in a subsequent suspension.

205.   As a direct result of Defendants' wrongful exercise of dominion over their driver's licenses and driving privileges, Plaintiffs and the Class suffered

damages including payments made to release property wrongfully withheld from them, reinstatement fees paid to the DMV each time their license was reinstated, out of pocket costs to obtain rides, and lost jobs and wages as a result of not having reliable transportation.

206.    Because Defendants' actions in this regard were done deliberately and with the intent of placing Plaintiffs and the Class in financial difficulty or put their jobs and ability to support their families at risk in order to force them to make payments, punitive damages should be awarded to Plaintiffs and the Class in addition to any other damages awarded by the Court and/or the jury.

<u>COUNT III</u>
**AIDING AND ABETTING CONVERSION**
**(Class Action Claim Against State Farm Only and in the Alternative to Count II Against State Farm)**

207.    Plaintiffs incorporate paragraphs 1 through 174 as if fully set forth in this Count.

208.    Plaintiffs assert this count against State Farm on a class basis for aiding and abetting the tort of Conversion under Florida common law.

209.    The Class Period for this count is four years prior to the date of the original filing of the Complaint in this matter. Because the class action claims in this matter stem from the same conduct underlying the class action allegations asserted in *Sanchez*, Plaintiffs are entitled to *American Pipe* tolling of the statute of limitations for all claims asserted herein from the original filing date in *Sanchez* of

April 7, 2021.  *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp 1512, 1528–29 (M.D. Fla. June 19, 1989).

210.    As set forth above, State Farm directs its subrogation law firms, including but not limited to the Law Firm, to request license suspensions from the DMV for the purpose of depriving its judgment debtor of the legal right to drive in order to force them to make payments on the judgment debts owed to State Farm. For this reason, Plaintiffs believe that State Farm, along with the other Defendants in this matter, is directly liable for Conversion under the Conversion Count set forth above.  This claim is advanced in the alternative to the direct Conversion Count only if it is determined that State Farm cannot be held directly liable for Conversion because Law Firm employees served the requests on the DMV seeking to suspend the driver's licenses of Plaintiffs and the Class.  Under this Count, State Farm is still liable for aiding and abetting the Conversion.

211.    Florida recognizes a cause of action for aiding and abetting common law torts.  *AmeriFirst Bank v. Bomar*, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991); *see also Ft. Myers Dev. Corp. v. J.W. McWilliams Co*., 97 Fla. 788, 122 So. 264, 268 (1929) (recognizing that liability may attach for "aiders and abettors of fraudulent promoters of corporations"); *Fonseca v. Taverna Imports, Inc.*, 212 So. 3d 431, 442 (Fla. 3d DCA 2017) ("Florida law recognizes a cause of action for aiding and

abetting the breach of a fiduciary duty."); *Roos v. Morrison*, 913 So. 2d 59, 68 n.1 (Fla. 1st DCA 2005) ("Florida courts recognize the 'acting in concert' basis for joint and several liability.").

212.    To state a claim for aiding and abetting a tort in Florida, a plaintiff must allege: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Lawrence v. Bank of Am., N.A.*, 455 Fed. Appx. 904, 906 (11th Cir. 2012) (applying Florida law).

213.    In *Taubenfeld v. Lasko*, 324 So.3d 529, 544 (Fla. 4th DCA 2021), the Florida Fourth District Court of Appeal specifically recognized aiding and abetting the common law tort of Conversion as viable claim.

214.    Here, State Farm directed and encouraged the Law Firm and other law firms to take steps to exercise dominion over the driver's licenses of Plaintiffs and the Class by making suspension requests to the DMV. The suspension requests were, in fact, served on behalf of State Farm as the underlying judgment creditor.

215.    State Farm requires its subrogation law firms to make routine reports at regular intervals regarding any collection efforts taken. As part of those reports, State Farm was aware: (a) that Plaintiffs and members of the class were properly insured at the time of the accident; (b) that funds had been paid to State Farm by the judgment

debtor's insurance company showing again that they were properly insured; and that (c) despite their being properly insured the Law Firm was seeking to have their drivers' licenses suspended in order create financial pressure to make payments to State Farm on the underlying judgment debt.

216.   In fact, on information and belief it was State Farm who orchestrated the entire license suspension scheme which it, in turn, required all of its subrogation law firms to follow.

217.   As a result, State Farm is liable to Plaintiffs and the Class for aiding and abetting conversion if it is not found directly liable under the Conversion Count set forth above.

218.   As a direct result of State Farm aiding and abetting the Law Firm's wrongful exercise of dominion over their driver's licenses and driving privileges, Plaintiffs and the Class suffered damages including payments made to release property wrongfully withheld from them, reinstatement fees paid to the DMV each time their license was reinstated, out of pocket costs to obtain rides, and lost jobs and wages as a result of not having reliable transportation.

219.   Because Defendants' actions in this regard were done deliberately and with the intent of placing Plaintiffs and the Class in financial difficulty or put their jobs and ability to support their families at risk in order to force them to make

payments, punitive damages should be awarded to Plaintiffs and the Class in additional to any other damages awarded by the Court and/or the jury.

### COUNT IV
### ECONOMIC DURESS
### (Class Claim Against All Defendants)

220.   Plaintiffs incorporate paragraphs 1 through 174 as if fully set forth in this Count.

221.   This Count is for Economic Duress against all Defendants on behalf of Mr. Waters, Ms. Sangfield and the Class.

222.   The Class Period for this count is four years prior to the date of the original filing of the Complaint in this matter.  *See* Fla. Stat. § 95.11(3). Because the class action claims in this matter stem from the same conduct underlying the class action allegations asserted in *Sanchez*, Plaintiffs are entitled to *American Pipe* tolling of the statute of limitations for all claims asserted herein from the original filing date in *Sanchez* of April 7, 2021.  *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp 1512, 1528–29 (M.D. Fla. June 19, 1989).

223.   Under Florida law, economic duress permits an aggrieved party to rescind an agreement that was entered into under severe financial anxiety or pressure. The aggrieved party must show: (1) wrongful acts or threats, (2) financial

distress caused by the wrongful acts or threats, and (3) absence of a reasonable alternative course of action.

224.   After the driver's licenses of Plaintiffs and the Class were suspended due to unlawful requests Defendants made to the DMV, Plaintiffs and members of the class were placed under economic duress and in a state of financial distress because without a driver's license many of the routine tasks of daily life become extremely difficult, including commuting to work, school obligations for young children, caring for elderly parents, and running otherwise routine errands such as grocery shopping and attending medical appointments.

225.   Because the Florida DMV was not informed that Plaintiffs and the Class were properly insured at the time of the underlying accident, the DMV was under the mistaken impression that Plaintiffs and members of the class were uninsured. As a result, the DMV would only reinstate the driver's licenses of Plaintiffs and the Class if and when a "Judgment Consent Form" was filed by Defendants giving the DMV permission to reinstate the licenses because payment arrangements were made.

226.   As a result, there was no reasonable alternative course of action to Plaintiffs and Class members having to agree to make a large down payment followed by many monthly payments as required by Defendants.

227.   The effectiveness of losing one's driver's license and the financial distress caused thereby is evidenced by correspondence between Ms. Sangfield and the Law Firm's non-attorney employee charged with collecting payments.

After having her license suspended Ms. Sangfield wrote:

I greatly apologize. I'm at work and was rushing. My current address is 720 Fairfax Drive, Pensacola, Florida 32503. I am on food stamps and get $523/mo for my children and I. This is how we receive our health insurance (Medicaid). As far as the offer, I don't have a down payment today but you told me to complete it and send it in to you anyways. With me working part time, fighting child support, going to school and trying to pay the couple of bills I do have is an absolute struggle, which will all be over soon. Being a single parent, a caregiver and trying to help my parents is why I desperately need my driver's license because so many people depend on me and I'm only one person. I could try to pay $40/ mo until I graduate school in May. Please let me know if you need any additional information.

On February 1, 2022, the Law Firm's non-lawyer employee wrote back to Ms. Sangfield demanding the following:

I understand your situation but I need you to remember that this payment arrangement is to reinstate your license and keep your father's license valid. I told you to fill out the form & put some type of an offer on the last page. You left it blank. I also told you that due to your payment history there would have to be some type of a down payment. Whatever that may be, I just need a number. I read you're offering $40/month. But there has to be some type of a down payment. If you read the form you filled out, you'll see the usual down payment to reinstate is 33%. We lowered that to 10%. Just so you know what I'm up against to try & get this approved for you. I need you to know that if you default on this new payment arrangement you will have a 10% down payment & there will be nothing I can do about that. In the offer field, specify that you're offering $__ for down payment & $40/month. And that you'll increase in May after your graduation.

Ms. Sangfield responded to Ms. Vance's demand with the following:

Yes ma'am. I totally understand if I default on this new arrangement that I will have a 10% down payment. I just desperately need my license. I currently have a friend that "said" she is going to try to help me with some kind of down payment, I just don't have it at the moment. Once I get a down payment, I will submit for payment. Please be mindful, that after graduation and taking my state NHA certification exam, I would need just a little time for new job placement. I promise to keep in contact and keep you informed as to what is going on. Sorry for the late response. Have been in class all day and will be starting 12hr clinicals in the hospital tomorrow. Having this email correspondence with you is the best for me. Thank you for all that you're trying to do to help me get my license reinstated.

228.    On or about May 5, 2022, Ms. Sangfield called back to request the amount of a down payment and the Law Firm's non-lawyer employee, Jennifer Vance replied with the following demand:

I spoke with the client regarding your offer of $500.00 down payment & $40.00/month. The client is requesting the past due balance as a down payment, which in this case would've been $1k. But I've asked them to accept $640.00 as a down payment instead. They are requesting $50.00/month. Please advise if you'd like to accept this offer to reinstate your license. I know I said it before, I just have to reiterate, if you're going to be late, please call me BEFORE you miss your payment. That's the only way I can help you.

229.    The same is true for Plaintiff Waters who made payments only because they were demanded as a condition of getting his license reinstated (although it never should have been suspended in the first place).

229.    In May of 2022, Mr. Waters contacted the Law Firm by phone to make arrangements to get his license reinstated so that he could return to work. The Law

Firm demanded that Mr. Waters make a $300 "down payment" with $100 monthly payments thereafter. The Law Firm memorialized its demand in a letter, which stated:

> This is to confirm you have agreed to pay $300.00 by Thursday, May 26, 2022 and $100.00 per month thereafter by the 26th day of each month beginning Sunday, June 26, 2022. Upon receipt of your down payment in certified funds, we will issue a letter consenting to the reinstatement of your driving privileges, in so far as the judgment had the same effect. This arrangement will expire on 5/25/2023 unless you have contacted this firm and negotiated larger payments before that deadline. Your balance will continue to accrue interest in accordance with Florida Statutes.

230.    As this correspondence makes clear, agreeing to make a down payment followed by monthly payments was the only available option available to Plaintiffs and the Class as they were unaware that Defendants did not have the legal right to suspend their licenses. Because these threats were made after their license had been suspended once already, Plaintiffs and the Class had no reasonable choice but to pay. Because Plaintiffs and members of the Class were under economic duress when they agreed to make such payments, all payments made by Plaintiffs and the Class as a condition of driver's license reinstatement should be returned with interest.

## COUNT V
## VIOLATION OF THE FEDERAL RICO ACT UNDER 1962(c)
### (Class Action Claim Against All Defendants)

231.    Plaintiffs incorporate the foregoing paragraphs 1 through 174 as if fully set forth in this Count.

232.   The Class Period for this count is four years prior to the date of the original filing of the Complaint in this matter. *See* Fla. Stat. § 95.11(3). Because the class action claims in this matter stem from the same conduct underlying the class action allegations asserted in *Sanchez*, Plaintiffs are entitled to *American Pipe* tolling of the statute of limitations for all claims asserted herein from the original filing date in *Sanchez* of April 7, 2021. *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp 1512, 1528–29 (M.D. Fla. June 19, 1989).

233.   The association in fact between State Farm and the Law Firm is an "enterprise" within the meaning of 18 U.S.C. § 1961(4). (Hereafter, this enterprise will be referred to as the "Illegal License Suspension Enterprise," or "the Enterprise.")

234.   State Farm and the Law Firm jointly direct the affairs of the Enterprise. They have been operating this Enterprise continuously since well before 2017 until the Law Firm's withdrawal from the Enterprise in early 2024 as a result of the *Sanchez* litigation.

235.   The Enterprise is engaged in activities affecting interstate commerce, to wit, the representation of a nationwide insurance company that is based in Illinois.

236.   The Enterprise regularly uses the interstate wire system in its affairs, including the initial referral of a case from State Farm to the Law Firm, and the Law Firm's transmission of case reports back to State Farm.

237.   The Enterprise regularly uses the United States mail in its affairs. The letters that, upon information and belief, the Law Firm mailed to Plaintiffs and the Class, using the threat of an illegal license suspension to induce them to pay a debt, and the ones it mailed to the DMV seeking the suspension of Plaintiffs' driver's licenses on repeated occasions (while withholding the fact that Plaintiffs had the required minimum insurance and had already tendered payment under their policies to State Farm), constituted chargeable acts of mail fraud in that they were sent in furtherance of a scheme to defraud Plaintiffs and the DMV.

238.   Similar form letters were sent to absent members of the Hiday and Ricke Subclass and to the DMV about them.

239.   The conduct alleged herein also constitutes extortion under Florida law. Florida Statute § 836.05 states that whoever, by written or printed communication, maliciously threatens an injury to the property of another with intent to extort money or to do an act against her will has committed extortion.

240.   The letters sent to Plaintiffs and the Hiday and Ricke Subclass threatening to have their driver's licenses suspended unless payments were made on

the judgment debts being collected by the Law Firm, constitute chargeable acts of extortion as additional RICO predicate acts.

241.   These were not isolated acts of mail fraud and/or extortion. On the contrary, they were part of a pattern of hundreds, if not thousands, of similar acts of mail fraud and/or extortion conducted over a period of many years and, upon information and belief, are still continuing today.

242.   In violation of 18 U.S.C. § 1962(c), Defendants Jeff Ricke and Robert Hiday conducted or participated in the affairs of the Enterprise through a pattern of racketeering activity, specifically, mail and wire fraud.

243.   Plaintiffs suffered economic harm by reason of the said violation of 18 U.S.C. § 1962(c), including monetary harm each and every time they paid the Law Firm (under the threat of suspension or in order to obtain reinstatement of the illegal suspended licenses) or paid the DMV to reinstate their license as a result of Defendants' scheme.

244.   Members of the Hiday and Ricke Subclass suffered similar losses, including, payments made to the Law Firm and the DMV.

245.   By reason of the damages directly sustained by Plaintiffs and the Subclass from the injuries to their business and/or property, they are entitled to treble damages, as well as reasonable attorney's fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT VI
## VIOLATION OF THE FEDERAL RICO ACT UNDER 1962(d)
### (Class Action Claim Against All Defendants)

246.   Plaintiffs incorporate paragraphs 1 through 174 as if fully set forth in this Count.

247.   In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c), in that, with actual or constructive knowledge of the fraudulent nature of the debt collection tactics to be employed by the Law Firm, they mutually agreed that these illegal tactics would be used, employing the interstate mail and wire systems to threaten judgment debtors  with license suspensions Defendants had no legal right to obtain, and to fraudulently request the DMV to suspend the licenses of drivers who, in fact, had the required insurance coverage at the time of their accidents and therefore were not subject to suspension under Florida law.

248.   Plaintiffs and the other members of the Hiday and Ricke Subclass suffered the economic injuries enumerated above.

249.   By reason of the economic injuries directly sustained by Plaintiffs and the other members of the Hiday and Ricke Subclass, they are entitled to an award of treble damages against Defendants, as well as reasonable attorney's fees and costs, pursuant to 18 U.S.C. § 1964(c).

**COUNT VII**
**ABUSE OF PROCESS**
**(Class Action Claim Against All Defendants)**

250.   Plaintiffs incorporate paragraphs 1 through 174 as if fully set forth in this Count.

251.   The Class Period for this count is four years prior to the date of the original filing of the Complaint in this matter. *See* Fla. Stat. § 95.11(3). Because the class action claims in this matter stem from the same conduct underlying the class action allegations asserted in *Sanchez*, Plaintiffs are entitled to *American Pipe* tolling of the statute of limitations for all claims asserted herein from the original filing date in *Sanchez* of April 7, 2021. *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp 1512, 1528–29 (M.D. Fla. June 19, 1989).

252.   Under Florida law, "[a] cause of action for abuse of process contains three elements: (1) that the defendant made an illegal, improper, or perverted use of process; (2) that the defendant had ulterior motives or purposes in exercising such illegal, improper, or perverted use of process; and (3) that, as a result of such action on the part of the defendant, the plaintiff suffered damage." *S & I Investments v. Payless Flea Market, Inc*., 36 So. 3d 909, 917 (Fla. 4th DCA 2010).

253.   In order to further the shared purpose of collection of amounts due from judgment debtors, the Defendants initiated the suspension of Plaintiffs' driver's

licenses with the Florida DMV pursuant to the process for suspending driver's licenses of judgment debtors under Fla. Stat. § 324.111.

254.   The initiation of the process for suspension of the drivers' licenses of Plaintiffs and the Class was illegal and improper because Plaintiffs and members of the Class were properly insured pursuant to the 10/20/10 minimum required limits.

255.   The Defendants' improper malicious and ulterior motives or purpose in improperly using the administrative functions of the DMV, pursuant to the entry and submission of the judgment by the trial court pursuant to § 324.111, was for the exclusive purpose of abusing and harassing Plaintiffs and the Class in order to put pressure on Plaintiffs and the Class to pay money towards their judgment debt for Defendants' own pecuniary gain.

256.   As a result of Defendants' abuse of process, Plaintiffs and the Class had their drivers' licenses wrongfully suspended.

257.   Thus, Defendants are liable for abuse of process because their use of the DMV to suspend the driving privileges of Plaintiffs and the Class was not justified pursuant to § 324.111; rather, Defendants knowingly abused the "process" of requesting revocation of drivers' licenses for the purpose of extorting Plaintiffs and the Class for Defendants' own pecuniary gains. *See S & I Investments*, 36 So. 3d at 917.

258.    The suspension of Plaintiffs' driver's license caused injury to the property of Plaintiffs as follows:

a.    loss of their driver's license and driving privileges;

b.    the out-of-pocket costs associated with the loss of their driver's license, including but not limited to the cost each and every time to reinstate their license, loss of employment, costs of transportation, costs associated with criminal charges, if any, as a result of driving on a suspended license;

c.    The loss of their jobs or job opportunities as a result of not being able to drive due to the suspension of their driver's license as a result of Defendants' wrongful conduct;

d.    The payment of reinstatement fees to the DMV each time their license was reinstated after suspension, which should never have been suspended;

e.    The cost of SR22 insurance, which they should not have had to pay; and

f.    Other harms and losses to be proved at trial.

259.    Under Florida law, a plaintiff is entitled to recover "special damages" in an action for abuse of process. *See Bothmann v. Harrington*, 458 So. 2d 1163, 1170 (Fla. 3d DCA 1984).

260.    The "special damages" recoverable are the pecuniary losses resulting directly and immediately from the tort and the expenses incurred to counteract such abuse of process. *Id.*

261.  In addition, punitive damages are also recoverable in an abuse of process action where a plaintiff establishes actual malice or that "the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." *Id.* at 1171; Fla. Stat. § 768.72.

262.  "Malice" as defined under Florida law means "intentionally" and "without lawful justification." *O'Flaherty-Lewis v. State*, 230 So. 3d 15 (Fla. 4th DCA 2017).

263.  Defendants intentionally initiated the suspension of Plaintiffs' and other Class members' driver's licenses knowing they were without lawful justification to do so because Plaintiffs and Class members had purchased the requisite minimum insurance. Defendants even refused to reinstate Plaintiffs' driver's licenses after being provided ample proof that the suspension was unlawful under the 1958 Attorney General opinion and being given the opportunity to do so. Accordingly, Plaintiffs and the Class are entitled to punitive damages for Defendants' actual malice in perpetrating the abuse of process.

264.  By reason of the damages directly sustained by Plaintiffs and the Class from the injuries to their property, including the suspension of their driver's licenses

and the payment of money, they are entitled to special and punitive damages resulting from Defendants' acts, as well as an award of court costs.

## COUNT VIII
## UNJUST ENRICHMENT
### (Class Action Claim Against All Defendants)

265.    Plaintiffs incorporate paragraphs 1 through 174 as if fully set forth in this Count.

266.    The Class Period for this count is four years prior to the date of the original filing of the Complaint in this matter. *See* Fla. Stat. § 95.11(3). Because the class action claims in this matter stem from the same conduct underlying the class action allegations asserted in *Sanchez*, Plaintiffs are entitled to *American Pipe* tolling of the statute of limitations for all claims asserted herein from the original filing date in *Sanchez* of April 7, 2021. *American Pipe & Construction Co. v. Utah*,414 U.S. 538 (1974); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp 1512, 1528–29 (M.D. Fla. June 19, 1989).

267.    Florida courts have long recognized a cause of action for unjust enrichment "to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity." *Butler v. Trizec Props., Inc.,* 524 So. 2d 710, 711 (Fla. 2d DCA 1988).

268.    Plaintiffs and the Class conferred a benefit upon Defendants in the form of money payments made under threat of Defendants' illegal driver's license suspension scheme.

269.    Defendants voluntarily accepted and retained the financial benefit conferred.

270.    Under the circumstances of Defendants illegal driver's license suspension scheme, wherein Defendants violated Florida law and made threats to Plaintiffs and the Class, to coerce payments by taking away their ability to drive a vehicle, it would be inequitable for Defendants to retain the benefit.

271.    Under Florida law, the common law persists unless it is expressly overridden by statute. *See, e.g.*, *State v. Ashley*, 701 So. 2d 338, 341 (Fla. 1997) ("Even where the legislature acts in a particular area, the common law remains in effect in that area unless the statute specifically says otherwise ...."); *Thornber*, 568 So. 2d at 918 ("Whether a statutory remedy is exclusive or merely cumulative depends upon the legislative intent as manifested in the language of the statute").

272.    Defendants' violation and abuse of Florida Statutes § 324.121 may serve as the basis of an unjust enrichment claim even where the statute has no private right of action. *See, Thornber v. City of Fort Walton Beach*, 568 So. 2d 914, 918 (Fla. 1990)).

273.    Because Plaintiffs and members of the Class were subjected to Defendants' unlawful license suspension scheme when they agreed to make payments on their judgment debts, it would be contrary to the fundamental principles of equity and justice to allow Defendants to retain these ill-gotten gains.  As a result, all payments made by Plaintiffs and the Class under threat of driver's license suspension should be returned with interest.

**COUNT IX**
**RELIEF UNDER THE DECLARATORY JUDGMENT ACT**
**28 U.S.C. § 2201, *et seq.***
**(Class Action Claim Against All Defendants)**

274.    Plaintiffs incorporate the foregoing paragraphs 1 through 174 as if fully set forth in this Count.

275.    The Class Period for this count is four years prior to the date of the original filing of the Complaint in this matter. See Fla. Stat. § 95.11(3). Because the class action claims in this matter stem from the same conduct underlying the class action allegations asserted in Sanchez, Plaintiffs are entitled to American Pipe tolling of the statute of limitations for all claims asserted herein from the original filing date in Sanchez of April 7, 2021.  *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp 1512, 1528–29 (M.D. Fla. June 19, 1989).

276.    Declaratory relief "is intended to minimize the danger of avoidable loss and the unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2751 (4th ed.).

277.    The Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, offers a unique mechanism by which a party may seek to remedy and prevent ongoing harm in the form of declaratory and injunctive relief.

278.    Pursuant to 28 U.S.C. § 2201(a), the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." As such, this Court has the power to make binding declarations of the rights and obligations of the parties, and to adjudicate the disputes between them.

279.    There is an actual controversy between Defendants, Plaintiffs and members of the Class concerning the rights and obligations of the parties with regard to whether a properly insured Florida driver can have their driver's license suspended under Fla. Stat. § 324.131.

280.    Because Plaintiffs and members of the Class carried the minimum required insurance at the time of the accident, they never should be subject to suspension under Fla. Stat. § 324.131.

281.    Defendants, on the other hand, assert that there are no requirements in Chapter 324 which prohibit a creditor from requesting a license suspension even

when they know that the judgment debtor had the amount of insurance required by Florida law and even when they have already been paid under the qualifying policy.

282.   The controversy between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Considering the number of drivers on Florida roads covered by State Farm Insurance, Plaintiffs and members of the Class are relatively likely to be involved in accidents involving State Farm-insured drivers in the future, which could lead to additional license suspensions without good cause.

283.   Accordingly, Plaintiffs seek a declaratory judgment from this Court on whether Fla. Stat. § 324.131 can be used to suspend driver's licenses of judgment debtors who had the required insurance at the time of the accident.

284.   The declaratory relief requested herein will generate common answers that will settle the controversy related to Defendants' actions regarding license suspensions. There is an economy to resolving these issues as they have the potential to eliminate the need for continued and repeated litigation.

### COUNT X
### NEGLIGENT MISREPRESENTATION
### (Individual Claim By Plaintiffs Waters And Sangfield Against All Defendants)

285.   Plaintiffs incorporate paragraphs 1 through 174 as if fully set forth in this Count.

286.    This Count is for Negligent Misrepresentation against all Defendants on behalf of Mr. Waters, Ms. Sangfield and not on behalf of any Class members.

287.    The Class Period for this count is four years prior to the date of the original filing of the Complaint in this matter. *See* Fla. Stat. § 95.11(3). Because the class action claims in this matter stem from the same conduct underlying the class action allegations asserted in *Sanchez*, Plaintiffs are entitled to *American Pipe* tolling of the statute of limitations for all claims asserted herein from the original filing date in *Sanchez* of April 7, 2021. *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp 1512, 1528–29 (M.D. Fla. June 19, 1989).

288.    Common law fraud and negligent misrepresentation involve more or less the same elements of proof: (i) a false statement of fact; (ii) made for the purpose of inducing another to act in reliance thereon; (iii) action by the other person in reliance on the correctness of the statement; and (iv) resulting damage to the other person. *Gandy v. Trans World Computer Technology Group,* 787 So.2d 116, 118 (Fla. 2d DCA 2001) (*citing Mettler, Inc. v. Ellen Tracy, Inc.,* 648 So.2d 253 (Fla. 2d DCA 1994)); *Hasenfus v. Secord,* 962 F.2d 1556 (11th Cir.1992).

289.    The only difference between proving common law fraud and negligent misrepresentation is that in common law fraud a plaintiff must show that the defendant made a false statement that the defendant knew to be false, whereas with

negligent misrepresentation a plaintiff need only show that the defendant failed to ascertain the truth or falsity of his or her representation.

290.   Here, the Law Firm threatened to suspend Plaintiffs' drivers' licenses in its very first correspondence in connection with the underlying subrogation claim and through the collection of monthly payments that still continues at the time this Complaint was filed.

291.   For example, the Law Firm, on behalf of State Farm, sent the same Warning Letter to both Plaintiffs with a picture of a Florida driver's license with the word "SUSPENDED" across it.  This written communication was sent to Plaintiffs at the beginning of their subrogation case. **Exhibit  1**.

292.   The letter makes a direct misrepresentation that Defendants are legally permitted to suspend Plaintiffs' driver's licenses and that the only way to avoid the suspension was to make payment arrangements.  **Exhibit  1**.

293.   On October 15, 2020, Defendants sent Ms. Sangfield a copy of this routine letter which stated:

Re:  Our Client:  State Farm Mutual Automobile Insurance Company as Subrogee of Timothy
Hauck
Kashana Odessa Sangfield


Our file:  201703616

## Warning

Dear Kashana Odessa Sangfield:

Soon we will notify the State of this unpaid claim and request that they suspend your driving and registration privileges.  If your license is suspended, you may be required to carry SR22 insurance.

**Contact our office immediately at 877-235-0060 to avoid suspension of your license.**



Hiday & Ricke, P.A.

294.  After Plaintiffs' driver's licenses were successfully suspended at the request of the Law Firm and State Farm, the Law Firm on behalf of State Farm sent a second standard form communication to Plaintiffs which again asserted that it had the legal right and ability to suspend their licenses:

Re: State Farm Mutual Auto Insurance Company

The Court has now entered a Final Judgment against you. This Judgment has been recorded and is a lien on all of your non-exempt personal property.

Additionally, pursuant to Florida Statute 324.121(1), we have now suspended your driving and registration privileges and you are no longer permitted to drive on the streets of this State.

If you would like your license reinstated you have to complete the attached form fax it back to 904-606-0128, email it to

jvance@hidayricke.com or mail it to our office ASAP and call us to work out an arrangement.

**Exhibit 2.**

295. Combined, these letters plainly make the misrepresentation that Defendants were legally permitted and authorized to suspend Plaintiffs' driver's licenses for failure to make payment arrangements on the underlying judgment debt. However, as Judge Corrigan's March 2023 Order clarified, such requests were not lawful because Plaintiffs and the Class were properly insured. As a result, these representations were false when made.

296. Mr. Waters and Ms. Sangfield relied on these false statements because they believed that Defendants had the legal right to suspend their driver's licenses not only because they represented that they had the power to do so, but in fact, had already suspended their licenses once before. This reliance caused Plaintiffs to borrow money and make other financial arrangements to pay Defendants at great personal sacrifice to them and their families in order to have their license reinstated.

297. Additionally, reliance on the misrepresentation that Defendants had the legal right to suspend their driver's licenses caused Mr. Waters and Ms. Sangfield not to immediately seek the assistance of counsel or to go to the Court or to the DMV to request separate relief. Instead, Plaintiffs were led to believe that the actions taken against them by Defendants and the DMV were lawful, when they were not.

298. As a result of these negligent misrepresentations, Plaintiffs made payments to Defendants that they would not have made but for the license suspension and/or threat of license suspension. Plaintiffs also suffered many months of unlawful license suspension because they were misled to believe that Defendants' actions regarding license suspensions were lawful. Had they known these actions were unlawful, they would have sought counsel or would have requested assistance from the court in the underlying subrogation actions or asked the DMV to reverse the suspensions of their licenses. Defendants are liable for such damages.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  April 2, 2024                **VARNELL & WARWICK, P.A.**

By:    /s/ Brian W. Warwick
Brian W. Warwick; FBN:  0605573
Janet R. Varnell; FBN:  0071072
Jeffrey L. Newsome: 1018667
Christopher J. Brochu: 1013897
Pamela Levinson, 538345
400 N. Ashley Dr., Ste. 1900
Tampa, FL  33602
Telephone:  (352) 753-8600
Facsimile:  (352) 504-3301
*bwarwick@vandwlaw.com*
*jvarnell@vandwlaw.com*
*jnewsome@ vandwlaw.com*
*cbrochu@vandwlaw.com*
*plevinson@vandwlaw.com*
*ckoerner@vandwlaw.com*

**LANGER GROGAN & DIVER, P.C.**

/s/ Irv Ackelsberg
Irv Ackelsberg
(Pro Hac Vice forthcoming)
Mary Catherine Roper
(Pro Hac Vice forthcoming)
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Telephone: (215) 320-5660
Fax: (215) 320-5703
iackelsberg@langergrogan.com
mroper@langergrogan.com